UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FURNISHARE INC.,

Plaintiff,

-v-

TRAVELERS PROPERTY CASUALTY COMPANY OF
AMERICA, THE TRAVELERS INDEMNITY COMPANY
OF CONNECTICUT, *and* STATE FARM INDEMNITY
COMPANY,

Defendants.

---

STATE FARM INDEMNITY COMPANY,

Cross-Claimant,

-v-

TRAVELERS PROPERTY CASUALTY COMPANY OF
AMERICA, *and* THE TRAVELERS INDEMNITY
COMPANY OF CONNECTICUT,

Cross-Defendants.

---

TRAVELERS PROPERTY CASUALTY COMPANY OF
AMERICA, *and* THE TRAVELERS INDEMNITY
COMPANY OF CONNECTICUT,

Cross-Claimants,

-v-

STATE FARM INDEMNITY COMPANY,

Cross-Defendant.

---

22 Civ. 2245 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This decision resolves a coverage dispute among insurers arising out of an accident in which employees of a furniture company, while moving a couch in a stairwell, hit a sprinkler head, causing the release of water throughout the building and substantial property damage.

Plaintiff Furnishare Inc. ("Furnishare"), a furniture sales and moving company, brought this declaratory judgment action against two insurers (or sets of insurers) to clarify whose policies cover the accident.  The first consists of affiliated insurers Travelers Property Casualty Company of America ("Travelers America") and The Travelers Indemnity Company of Connecticut ("Travelers Connecticut") (together, "Travelers").  Furnishare entered into two substantively coterminous commercial general liability ("CGL") insurance policies with Travelers: (1) one with Travelers Connecticut (the "Primary CGL Policy"), Dkt. 78, Ex. A; and (2) an excess and umbrella CGL policy with Travelers America (the "Excess CGL Policy"), *id.*, Ex. B (together, the "Travelers CGL Policy").  The second consists of State Farm Indemnity Company ("State Farm"), with which Furnishare entered into a Standard Car Policy (the "State Farm Auto Policy"), *id.*, Ex. C.

The parties agree that Furnishare is entitled to coverage under either the Travelers CGL Policy or the State Farm Auto Policy.  That is because, as all agree, one insurer's policy leaves off where the other's begins:  The Travelers CGL Policy covers accidents "before" the "loading" of a car begins, and the State Farm Auto Policy covers accidents "after" that point.[1]  *See, e.g.*,

---

[1] *See* Furnishare Mem. at 16 ("State Farm's Auto Policy and the CGL Policies mirror each other and provide complete coverage, with one picking up where the other left off."); Travelers Mem. at 20 ("[I]f one carrier's policy responds to the Textile Building Claims, likely the other carrier's policy does not."); State Farm Mem. at 22 ("[T]he policies are mutually exclusive."); *cf., e.g.*, *Harleysville Worcester Ins. v. Wesco Ins. Co., Inc.*, 314 F. Supp. 3d 534, 550 (S.D.N.Y. 2018) (for same reasons CGL policy applied, auto policy did not), *aff'd sub nom. Harleysville Worcester Ins. v. Wesco Ins.*, 752 F. App'x 90 (2d Cir. 2019); *Cent. N.Y. Reg'l Transp. Auth. v. Burlington Ins. Co.*, No. 15 Civ. 22 (DNH), 2016 WL 6781470, at *6 (N.D.N.Y. Sept. 7, 2016)

4/14/23 Oral Arg. Tr. ("Tr.") at 10, 29.  The decisive question as to which policy applies turns on whether the accident occurred before, or during, the "loading" of Furnishare's truck.  Furnishare argues that the Travelers CGL Policy, which covers a higher loss than the State Farm Auto Policy, applies.  It seeks a declaration that Travelers is obligated to defend and indemnify it for property damage resulting from the accident.  Dkt. 32 ("SAC") ¶¶ 59–73.  Alternatively, Furnishare seeks a declaratory judgment to the same effect against State Farm.  *Id.* ¶¶ 74–80. Travelers and State Farm deny a duty to defend or indemnify Furnishare; each brings crossclaims against the other.

Pending now are mirror-image summary judgment motions on the declaratory judgment claims.[2]  The underlying facts are undisputed.

For the following reasons, the Court, applying case law involving like insurance policy provisions covering or excluding accidents during the "loading" of an automobile, finds that the accident in the stairwell here occurred before, and not during, "loading."  Accordingly, the Court holds, the Travelers CGL Policy applies, because the automobile exclusion in that policy was not triggered, and the reciprocal State Farm Auto Policy does not apply.  The Court therefore grants the summary judgment motions by Furnishare and State Farm for declaratory relief, and denies Travelers's summary judgment motion on those claims.

I.    **Background**

---

("[T]he purpose of an auto exclusion in a commercial general liability insurance policy is to preclude liability for losses that would be covered under the 'mirror image' insuring agreements found in automobile liability policies—the auto coverage 'picks up' where the commercial general liability coverage 'leaves off.'").

[2] Furnishare also brings a breach of contract claim against Travelers for breaching its policy obligations.  Dkt. 32 ¶¶ 66–73.  Although the memoranda of both Furnishare, Dkt. 85, and Travelers, Dkt. 94, allude to this claim in a manner implying an intent to move on it, and although the fate of that claim would appear to track that of Furnishare's declaratory judgment claim, neither party has addressed that claim.

A.      **Factual Background**[3]

1.      **The Parties**

Furnishare operates a website through which customers buy and sell furniture under its trade name, Kaiyo.  Emiroglu Decl. ¶ 2; Travelers 56.1 ¶ 1.  When a customer sells a piece of furniture, Furnishare sends a team to remove the furniture from the seller's premises and transport it to Furnishare's warehouse.  There, it is processed and listed for sale on the website. Emiroglu Decl. ¶ 3; Travelers 56.1 ¶ 2.

At all relevant times, Furnishare rented an office, JSF ¶ 6, and had its headquarters at 750 Lexington Ave., Floor 9, New York, NY, 10022 (the "New York address").  Emiroglu Decl. ¶ 6;

_____

[3] The Court draws its account of the underlying facts of this case—which are undisputed—from the parties' joint statement of undisputed facts ("JSF").  Dkt. 78.  The Court also draws upon the parties' submissions in support of and in opposition to their summary judgment motions.  These include: (1) in support of State Farm's motion, State Farm's memorandum of law, Dkt. 83, supporting declarations, Dkts. 82, 84, Rule 56.1 statement, Dkt. 91 ("State Farm 56.1"); (2) in support of Furnishare's motion, Dkt. 85, Furnishare's memorandum of law, Dkt. 86, supporting declarations, Dkts. 87, 88 ("Emiroglu Decl."), and Rule 56.1 statement, Dkt. 89 ("Furnishare 56.1"); (3) in opposition to State Farm and Furnishare's motions, and in support of Travelers's cross-motion, a memorandum of law, supporting declaration, Dkt. 96, and Rule 56.1 statement, Dkt. 97 ("Travelers 56.1"); (4) in further support of its motion, and in opposition to Travelers's cross-motion, Furnishare's Opposition, Dkt. 100; (5) the same, as to State Farm, Dkt. 102; and (6) in further support of its cross-motion, Travelers's Reply, Dkt. 105.

Citations to a party's Rule 56.1 statement incorporate by reference the materials cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Travelers 56.1 ¶ 4.[4]  Furnishare's business registration and certificate of authority with New Jersey listed the New York address as Furnishare's business address, JSF ¶¶ 7–8, as did its business registration in Delaware, *id.* ¶ 9.

Furnishare fulfilled 81% of its 2021 orders and generated 56% of its 2021 revenue in New York.  Emiroglu Decl. ¶ 7; Travelers 56.1 ¶ 5.  It pays New York state income, family leave, and reemployment service fund taxes.  Emiroglu Decl. ¶ 8; Travelers 56.1 ¶ 6.  The Travelers policies charge Furnishare a New York property liability guaranty surcharge and New York fire insurance fee.  JSF, Ex. A at 7.  They list the New York address and a New Jersey address, *see, e.g.*, *id.*, Ex. A at 3, and include sections outlining both "New York" and "New Jersey changes" to various standard policy features, *id.*, Ex. A at 8–9.

### 2. The Insurance Policies

The parties have stipulated to the authenticity of the three policies at issue.  JSF ¶¶ 10–12, 16.

The two Travelers CGL policies are substantively identical, save as to coverage limits.  Both cover Furnishare for the period December 14, 2020 to December 14, 2021.  *Id.* ¶¶ 11–12.  The Primary CGL policy provides for liability coverage for "sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage,'" except insofar as such damages are excluded from the policy's coverage.  *Id.*, Ex. A at 55.  Its coverage limit is $1 million per occurrence, with an aggregate $2 million limit, *id.* ¶ 11.  It defines "property damage" as "physical injury to tangible property, including all resulting loss of use of that

---

[4] Several statements in Furnishare's 56.1 statement cite to non-corresponding paragraphs of the Emiroglu Declaration.  Travelers does not dispute the content of these statements, but denies that their cited paragraphs provide the requisite support.  The Court treats such statements as undisputed and cites to the correct paragraphs in the Emiroglu Declaration.

property," *id.* ¶ 14.  The Excess CGL policy incorporates the same "terms, conditions, agreements, exclusions and definitions" as the Primary CGL Policy, *id.* ¶ 13, but it has a higher coverage limit.  It covers property damage of up to $4 million per occurrence, with a $4 million aggregate limit.  *Id.* ¶ 12; *see also id.*, Ex. B at 3.[5]  Together, these policies thus provide up to $5 million coverage per occurrence.  *See* Tr. at 11.

> Both policies contain the following "auto exclusion," which excludes any coverage of
>
> '[b]odily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any . . . 'auto' . . . owned or operated by or rented or loaned to any insured.  Use includes operation and 'loading or unloading.'  This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured.

JSF, Ex. A at 58 (Primary CGL policy); *id.*, Ex B. at 14 (Excess CGL policy).  Both Travelers policies define "loading and unloading" to include "handling of property . . . [a]fter it is moved from the place where it is accepted for movement into or onto an . . . auto."  *Id.*, Ex. A. at 72 (Primary CGL policy); *id.*, Ex. B at 24 (same, Excess CGL policy).

The State Farm Auto Policy covers the period August 3, 2021 to February 3, 2022, and up to $1 million per accident.  *See id.* ¶ 16.  Like the Travelers CGL Policy, it covers "damages an insured becomes legally liable to pay because of . . . bodily injury to others and . . . damage to property, caused by an accident that involves a vehicle for which that insured is provided Liability Coverage by this policy."  *Id.*, Ex. C at 3.  But, in contrast to the Travelers CGL Policy, the State Farm Auto Policy excludes coverage for "damages resulting from . . . the handling of property *before* it is moved from the place where it is accepted by the insured for movement into or onto a vehicle."  *Id.*, Ex. C at 24 (emphasis added).

---

[5] All citations as to policies' page numbers are to their Bates-stamped page numbers.

No policy at issue further defines the above provisions, including the terms "loading" or "place."  There is no extrinsic evidence in the record of the parties' subjective understanding of these terms at the time of the policies' formation.  *See* Tr. at 7, 23–24 (Furnishare), 40–42 (Travelers).

### 3.  The Accident and Its Aftermath

On November 10, 2021, a Furnishare team traveled to the Textile Building at 66 Leonard Street in lower Manhattan to pick up and remove a couch that a customer had sold through Furnishare's website.  Emiroglu Decl. ¶ 12; Travelers 56.1 ¶ 10.  To be removed, the couch had to be moved from the seller's sixth-floor condominium down at least five flights of stairs to the lobby.[6]  It then had to be taken out of the building's entrance to the city sidewalk, from where it would be placed in a Furnishare moving truck.  Emiroglu Decl. ¶ 13; JSF ¶ 3.

As the field team began to descend the sixth-floor staircase, the couch struck an exposed sprinkler head near the top of the stairwell.  This resulted in a large release of water.  Emiroglu Decl. ¶ 14; Travelers 56.1 ¶ 12.  At the time of the accident, Furnishare's moving truck was parked on the curb of a public street outside of the Textile Building.  JSF ¶ 5.  The water release caused by the accident irreparably damaged the couch.  More consequentially, it also caused millions of dollars' worth of property damage to the residences and belongings of multiple Textile Building occupants.  Emiroglu ¶ 15; Travelers 56.1 ¶ 14.

The Textile Building's bylaws define the stairwell and landing as "Common Elements" of the building, which are accessible to occupants and visitors.  JSF ¶ 4; Travelers 56.1 ¶ 13.  Under the applicable condominium rules, residents are responsible for damage caused by their personal property in common elements, such as the sixth-floor stairwell, in addition to within

---

[6] Although the parties stipulate that the condominium was on the sixth floor, the record is silent as to the number of flights of stairs between that floor and the ground level.

their residential units.  Travelers 56.1 ¶ 13; Dkt. 87-1 at 57 (Textile Building Bylaws: "All damage to the Building or Common Elements caused by the moving or carrying of any article therein shall be paid by the United Owner responsible for the presence of such article."). *But see* State Farm. 56.1 ¶ 13 (disputing only when title passed).

Triggering the instant lawsuit, the affected occupants of the Textile Building now seek relief from Furnishare (the "Textile Building claims"). *Id.* On December 6, 2021, Furnishare notified Travelers of the Textile Building claims and requested coverage. Emiroglu Decl., Ex. E; Travelers 56.1 ¶ 15. On December 28, 2021, Travelers denied any obligation to defend or indemnify Furnishare against these claims, citing the auto exclusion in the Travelers CGL Policy. Emiroglu Decl., Ex. F ("Travelers Denial"); Travelers 56.1 ¶ 16. On January 25, 2022, Furnishare contested Travelers's denial. Emiroglu Decl., Ex. G. On January 25, 2022, Travelers reiterated its denial. Emiroglu Decl. ¶ 18; Travelers 56.1 ¶ 19.

On January 11, 2022, Furnishare filed a claim with State Farm under its Auto Policy. *See* Emiroglu Decl. ¶ 19, Ex. H. On March 24, 2022, State Farm denied coverage, citing the Auto Policy's exclusion for "damages resulting from . . . the handling of property before it is moved from the place where it is accepted by the insured for movement into or onto a vehicle." *Id.*, Ex. I.

Between December 2021 and June 2022, several insurers for Textile Building occupants contacted Travelers with claims for damage arising from the accident. Travelers 56.1 ¶ 20. Travelers denied those claims on the same grounds as it had denied Furnishare's—that is, based on the auto exclusion. *Id.*

### B.       Procedural History

On January 31, 2022, Furnishare filed the Complaint, originally brought solely against Travelers, in New York State Supreme Court in Manhattan.  Dkt. 1-1.  On March 16, 2022, Furnishare filed the Amended Complaint, adding State Farm as a defendant.  Dkt. 1-2.  On March 18, 2022, Travelers removed the action to this Court on the basis of diversity jurisdiction.  Dkt. 1.  At the time, State Farm had not yet been served.[7]  Dkt. 20.

On April 25, 2022, Travelers moved to dismiss the Amended Complaint as against it.  Dkts. 22–25.  The same day, the Court ordered Furnishare to amend its complaint or oppose the motion to dismiss.  Dkt. 26.  On May 16, 2022, Furnishare filed the SAC.  Dkt. 32.[8]  On June 6, 2022, Travelers moved to dismiss the SAC, Dkts. 39–41; State Farm answered, and filed a crossclaim against Travelers, Dkt. 42.  On June 16 and 21, 2022, respectively, State Farm, Dkt. 44, and Furnishare, Dkt. 45, opposed Travelers's motion to dismiss.  On June 24, 2022, the parties submitted a joint letter, Dkt. 49, and a proposed case management plan, Dkt. 50.  On June 27, 2022, Travelers moved to dismiss the State Farm crossclaim.  Dkts. 51–53.  On June 28, 2022, the Court ordered State Farm to amend or oppose the motion to dismiss its crossclaim.  Dkt. 54.  On June 29, 2022, Travelers replied to its motion to dismiss the SAC.  Dkt. 55.  On July 5, 2022, the parties filed, Dkt. 56, and the Court approved, Dkt. 57, a case management plan.  On July 12, 2022, the parties withdrew their motions to dismiss.  Dkt. 58.  The same day, Travelers answered the SAC and crossclaimed against State Farm, Dkt. 59, and answered State Farm's

_____

[7] Neither State Farm Fire and Casualty Company, the incorrect State Farm entity Furnishare initially sued, nor State Farm Indemnity Company, the correct and current State Farm party, ever objected to removal.  *See infra* note 8.

[8] Furnishare was prompted to amend by the notice to the Court, on May 6, 2022, from counsel for State Farm that the Amended Complaint had named the incorrect State Farm entity, Dkt. 30, in response to which, on May 9, 2022, the Court granted leave to amend, Dkt. 31.

crossclaim, Dkt. 60.  On July 15, 2022, the Court terminated all pending motions to dismiss.
Dkt. 61.  On August 16, 2022, the Court approved a revised case management plan.  Dkt. 65.

On October 14, 2022, following limited discovery, the parties alerted the Court that they
intended to pursue summary judgment on the issue of whether the accident fell within the
Travelers CGL Policy's auto exclusion.  Dkts. 67–68.  On November 4, 2022, the parties filed
the JSF.  Dkt. 78.  On November 22, 2022, State Farm moved for summary judgment, Dkt. 81,
and filed a memorandum of law ("State Farm Mem."), Dkt. 83, and declarations, Dkts. 82, 84, in
support.  The same day, Furnishare moved for summary judgment, Dkt. 85, and filed a
memorandum of law ("Furnishare Mem."), Dkt. 86, declarations, Dkts. 87–88, and Rule 56.1
statement, Dkt. 89, in support.  On November 23, 2022, State Farm filed a counter Rule 56.1
statement ("State Farm 56.1").  Dkt. 91.  On December 16, 2022, Travelers cross-moved for
summary judgment, Dkt. 94, and filed a memorandum of law, Dkt. 95, declaration, Dkt. 96, and
Rule 56.1 statement ("Travelers 56.1"), Dkt. 97, in support.  On January 13, 2022, Furnishare
("Furnishare Opp."), Dkt. 100, and State Farm ("State Farm Opp."), Dkt. 102, opposed
Travelers's cross motion.  On January 27, 2023, Travelers replied ("Travelers Reply").  Dkt. 105.

On April 14, 2023, the Court held argument on the motions.  Dkts. 109–10 (scheduling).

## II.  Legal Standards for Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a
question of material fact.  In making this determination, the Court must view all facts "in the
light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132
(2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). When evaluating cross-motions for summary judgment, the Court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017).

## III.  Discussion

The decisive issue in this case is narrow, in light of the parties' considerable points of agreement. It is whether the accident—in which a couch hit a sprinkler head in the sixth-floor stairwell and triggered the building sprinkler system—occurred during the "loading" of a vehicle within the meaning of the policies. If so, the State Farm Auto Policy applies and the Travelers

CGL Policy does not, because the latter policy's auto exclusion applies.  But if the accident occurred before loading, then the Travelers CGL Policy applies, and the State Farm Auto Policy does not.

The ensuing discussion addresses three questions in sequence.  First, which state's law applies: New York's or New Jersey's?  Given the parties' agreement that there is no conflict between these laws, the Court applies New York law here, while finding New Jersey law in general substantive accord.  Second, insofar as the key policy provision defines "loading and unloading" to include handling of property after "it is moved from the place where it is accepted for movement into or onto an . . . auto," and insofar as the parties differ as to whether the term "place" here means the apartment (Travelers's view) or the building (Furnishare and State Farm's view) from which the couch was removed, is the word "place" textually ambiguous?  The Court finds that it is, requiring the Court to turn to the (surprisingly large) body of case law applying similar provisions in insurance policies to resolve this controversy.  Third, how do these precedents apply to the accident here?  The Court finds, with Furnishare and State Farm, that, based on the assembled precedents, the accident in the sixth-floor stairwell here was too remote from the Furnishare's truck waiting on the street, or from any use of it, to constitute "loading."

## A.     Choice of Law

"Federal courts sitting in diversity look to the choice-of-law rules of the forum state." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins.*, 363 F.3d 137, 143 (2d Cir. 2004).  Under New York choice-of-law rules, "the first step" is to determine "whether there is an actual conflict between the laws invoked by the parties."  *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir. 2001) (internal quotation marks omitted).  An actual conflict exists if "the applicable law from each jurisdiction provides different substantive rules" that are "relevant to the issue at hand" and

"must have a significant possible effect on the outcome at trial." *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 331 (2d Cir. 2005) (internal quotation marks, citations, and alterations omitted). However, in the absence of an actual conflict, "the Court need not embark on a choice-of-law analysis[]." *Perkins Eastman Architects, P.C. v. Thor Engineers, P.A.*, 769 F. Supp. 2d 322, 325 (S.D.N.Y. 2011) (internal quotation marks omitted).

Although the parties each contend that they would prevail under either state's precedents, each also agrees that, as salient here, New York and New Jersey law align. *See* State Farm Mem. ¶ 6; Travelers Mem. at 7 n.2, 11; Furnishare Mem. at 18–21; *see, e.g.*, Tr. at 5, 31. The Court, after an independent review of the relevant precedents, agrees. The cases applying "loading" provisions in automobile policies or automobile exclusions to GCL policies by their nature arise from idiosyncratic circumstances, but the bodies of such law in New York and New Jersey are substantively compatible. There is no basis to assume that the choice of law here would yield a different outcome.

Accordingly, the Court applies New York substantive law. *See, e.g.*, *Com. Union Ins. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir. 1999) (declining to conduct choice-of-law analysis where "it appears that the outcome would be the same under either New York or Florida law, and neither party has suggested otherwise"); *Pascarella v. Sandals Resort Int'l, Ltd.*, No. 19 Civ. 2543 (AT), 2020 WL 1048943, at *5 (S.D.N.Y. Mar. 4, 2020) (declining to conduct choice-of-law analysis and applying New York law where neither party identified significant differences between New York or Bahamian law); *Perkins Eastman Architects*, 769 F. Supp. 2d at 325–26 (same, where parties agreed same outcome would result under New York or New Jersey law). In light of the parties' agreement that the bodies of law are consistent, the Court also considers the

most apposite New Jersey precedents, which it finds reinforce the conclusion yielded by New York law.

### B.      Is the Auto Exclusion's Language Ambiguous?

The Court first considers whether the text of the policies yields a clear answer to this controversy.  As noted, the central policy language defines "loading" as beginning when an object "is moved from the place where it is accepted for movement into or onto . . . an auto." *Compare* JSF, Ex. A. at 72 (Primary CGL policy), *and id.*, Ex. B at 24 (same, Excess CGL policy), *with id.*, Ex. C at 24 (Auto Policy).

Travelers argues that "the place" can refer only to the inside of the condominium apartment from which the Furnishare movers first lifted the couch.  Travelers Mem. at 18–20.  On this reading, the automobile exclusion to the Travelers CGL Policy kicked in—and the responsibility to provide coverage shifted to State Farm's Auto Policy—the moment the couch exited the apartment.  Furnishare argues that "the place" could equally refer instead to the Textile Building.  Furnishare Mem. at 10–14; Furnishare Opp. at 12–15.  On that reading, because the couch was well inside the building, on a sixth-floor stairwell, at the time it struck the sprinkler head, the Travelers CGL Policy was in effect and the State Farm Auto Policy was not.  With the application of "place" ambiguous, Furnishare argues, the Court should apply, in its favor and against Travelers, the precept under New York law that ambiguities in insurance policies are construed in favor of the insured and against the insurer.[9]

The Court's assessment, as follows, is that a purely textual application of the term "the place" here does not yield a clear answer.  And although New York law construes ambiguities in insurance policies in favor of the insured and against the insurer, that principle does not break the

---

[9] State Farm did not express a view on whether the term "the place" is ambiguous.

deadlock here either.  That is because there are two mirror-image policies at issue (the Travelers

CGL Policy and State Farm Auto Policy); the insured will be covered under one or the other; and

the principle as to resolving ambiguities yields opposite outcomes depending on which whether

it is analyzed from the perspective of the Travelers or the State Farm policy.

### 1.    Applicable New York Law Principles

Under New York law, "[t]he construction of an insurance contract is ordinarily a matter

of law to be determined by the court."  *U.S. Underwriters Ins. Co. v. Affordable Hous. Found.,*

*Inc.*, 256 F. Supp. 2d 176, 180 (S.D.N.Y. 2003) (citing *Town of Harrison v. Nat'l Union Fire Ins.*

*Co. of Pittsburgh*, 89 N.Y.2d 308, 316 (1996)).  In resolving a summary judgment motion

involving contract interpretation, "a court should accord [contract] language its plain meaning

giving due consideration to the surrounding circumstances and apparent purpose which the

parties sought to accomplish."  *Palmieri v. Allstate Ins.*, 445 F.3d 179, 187 (2d Cir.

2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)); *see Lend Lease (US)*

*Constr. LMB Inc. v. Zurich Am. Ins.*, 28 N.Y.3d 675, 681–82 (2017) (same).  When contract

language is unambiguous, "the district court [may] construe it as a matter of law and grant

summary judgment accordingly."  *Palmieri*, 445 F.3d at 187.  "A contract is unambiguous if the

language it uses has a definite and precise meaning, unattended by danger of misconception in

the purport of the agreement itself, and concerning which there is no reasonable basis for a

difference of opinion."  *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007) (internal quotation

marks and alterations omitted).  But where "the policy may be reasonably interpreted in two

conflicting manners, its terms are ambiguous, and any ambiguity must be construed in favor of

the insured and against the insurer."  *Lend Lease (US) Constr.*, 28 N.Y.3d at 682 (internal

quotation marks and citation omitted); *see Duane Reade, Inc. v. St. Paul Fire & Marine Ins.*, 600

F.3d 190, 201 (2d Cir. 2010).  "However, provisions in a contract are not ambiguous merely

because the parties interpret them differently[]." *Mount Vernon Fire Ins. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 352 (1996) (internal quotation marks and citation omitted)

## 2. Discussion

Applied here, "the place where [property] is accepted" is susceptible of more than one reasonable interpretation. As Furnishare rightly notes, a reasonable person applying common speech could view "the place" at which the couch was accepted either as the seller's condominium unit *or* as the Textile Building itself. Either construction accords with ordinary usage of the term "the place." *See Dean v. Tower Ins. Co. of N.Y.*, 19 N.Y.3d 704, 708 (2012) ("Insurance contracts must be interpreted according to common speech and consistent with the reasonable expectation of the average insured."); *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011) (same). And the choice between the two constructions matters. Under the first, "loading" was underway at the time of the accident, and State Farm's policy governed; under the second, "loading" had yet to begin, and Travelers's policy governed.

Nor do various mechanisms sometimes available for resolving textual ambiguity assist here. The policy does not define the term "the place." And, as counsel agreed at argument, there is no extrinsic evidence as to how the parties, in entering into the policies, mutually understood this term.[10] Finally, although the case law—as reviewed below—has often applied "loading and

---

[10] *See* Tr. at 23–24; *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("[W]here the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered."); *Morgan Stanley Grp. Inc. v. New Eng. Ins.*, 225 F.3d 270, 275 (2d Cir. 2000) ("[A]mbiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (internal quotation marks omitted)).

unloading" provisions in CGL and automobile policies, it has not adopted a test as to how the term "the place" in such provisions is to be construed.[11]

The Court therefore finds the policies textually ambiguous as to when the "loading" process begins. *See, e.g.*, *Dean*, 19 N.Y.3d at 709 (policy term "residence premises" ambiguous where the term "reside" was not defined in contract and it was reasonable to find tenant's occupancy satisfying this term). Insofar as Travelers denies coverage—a duty to defend and indemnify Furnishare—on the ground that the "loading" exclusion clearly applies, that textual argument fails. *See Euchner-USA, Inc. v. Hartford Cas. Ins.*, 754 F.3d 136, 142 (2d Cir. 2014) ("When an exclusion clause is relied upon to deny coverage, the burden rests upon the insurance company to demonstrate that the allegations of the complaint can be interpreted *only* to exclude coverage." (quoting *Town of Massena v. Healthcare Underwriters Mut. Ins.*, 98 N.Y.2d 435, 444 (2002) (emphasis in original)); *id.* ("Exclusions are subject to strict construction and must be read narrowly.").

Were this case solely between Furnishare and Travelers, New York's interpretive principle that ambiguity is to be construed against the insurer would resolve this case, in favor of

---

[11] To the extent that courts within this District have found insurance policies containing similar "loading and unloading" language unambiguous, they have done so either without reference to, or without any consideration of, the policy text that reads "the place where [the property was] accepted." *See, e.g.*, *Nautilus Ins. v. 93 Lounge Inc.*, No. 14 Civ. 1029 (KAM) (ST), 2017 WL 1207528, at *7 (E.D.N.Y. Mar. 31, 2017) (finding no ambiguity in "bodily injury . . . arising out of the use of . . . any auto," including "loading and unloading," but not defining "loading and unloading"); *Tudor Ins. v. Golovunin*, No. 07 Civ. 4792 (KAM), 2013 WL 5437025, at *5–6 (E.D.N.Y. Sept. 27, 2013) (same); *U.S. Specialty Ins. v. LeBeau, Inc.*, 847 F. Supp. 2d 500, 504 (W.D.N.Y. 2012) (same); *see also Striker Sheet Metal II Corp. v. Harleysville Ins. Co. of N.Y.*, No. 16 Civ. 05916 (ADS) (AYS), 2018 WL 654445, at *5, *7 (E.D.N.Y. Jan. 31, 2018) (finding no ambiguity in contract containing identical language as to "mov[ing] an object] from the place where it is accepted," but not considering meaning of "the place" of acceptance because it was undisputed that the incident occurred during unloading).

insured Furnishare.  *Cf., e.g.*, *Hastings Dev., LLC v. Evanston Ins.*, 701 F. App'x 40, 43–44 (2d Cir. 2017) (summary order) (construing ambiguity against single insurer defendant); *Dean*, 19 N.Y.3d at 709 (same); *Cragg*, 17 N.Y.3d at 123–24.  The policy bases undergirding this principle are that: (1) ambiguous provisions should be construed against their drafters; and (2) contracts should be construed in favor of their general purpose—here, assuring coverage.  *See, e.g.*, *XL Specialty Ins. v. Level Glob. Invs., L.P.*, 874 F. Supp. 2d 263, 281 (S.D.N.Y. 2012) (as drafter, insurer has obligation to make its intention clearly known); *Metro. Prop. & Cas. Ins. v. Mancuso*, 93 N.Y.2d 487, 497 (1999) ("When an insurance carrier drafts an ambiguously worded provision and attempts to limit its liability by relying on it, we will construe the language against the carrier."); *see also Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (under New York law, courts must interpret contracts to realize their general purpose); *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324–25 (2007) (same).  But those policy bases are not meaningfully present here.  As all parties agree, the dispute in this case is, in reality, between two insurers— and regardless of the outcome of this declaratory judgment, one of them will provide coverage to Furnishare.  Indeed, although Furnishare initiated this lawsuit by suing Travelers, it now also sues State Farm for declaration that it is responsible for coverage.  And were the principle that ambiguities are to be construed against the insurer applied to the identical "loading" provision in the State Farm policy, it would yield the opposite result pursued by Furnishare: that State Farm, and not Travelers, is responsible for covering Furnishare.

At argument, Furnishare explained that it prefers coverage from Travelers over coverage from State Farm because, given the excess layer, the Travelers CGL Policy stands to provide a greater monetary recovery than the recovery  under the State Farm Auto Policy.  *See, e.g.*, Tr. at 10–13.  Had the State Farm policy furnished a higher coverage limit than Travelers's,

presumably Furnishare's preference would be the opposite. But Furnishare has not cited case

law in which textual ambiguity as to which of two competing insurers is responsible for an

insured's coverage is driven by the insured's preference between the two. *See id*. at 66–69. The

cases applying that interpretive principle instead uniformly have risen in disputes between an

insured and a single insurer where the insured's coverage hung in the balance. Without apposite

case law, the Court declines to extend the presumption beyond its familiar accepted context so as

to resolve this idiosyncratic controversy. *Cf, e.g.*, *CIH Int'l Holdings, LLC v. BT U.S., LLC*, 821

F. Supp. 2d 604, 611 (S.D.N.Y. 2011) (declining to apply New York state insurance law doctrine

outside of its specific insurance context); *Red Ball Interior Demolition Corp. v. Palmadessa*, 947

F. Supp. 116, 123–24 (S.D.N.Y. 1996) (declining to extend New York insurance law principle

that a notice provision in an insurance contract acts as a condition precedent to an

indemnification agreement), *aff'd*, 107 F.3d 4 (2d Cir. 1997).

### C.   Was the Accident Within "Loading" Under the Complete Operation Doctrine?

The Court accordingly turns to New York case law applying similar "loading and

unloading" provisions in CGL and automobile policies. Beginning with *Wagman v. American*

*Fidelity & Casualty Company*, 304 N.Y. 490 (1952), these cases have developed a gloss on the

meaning of "loading" termed the "complete operation" doctrine. Under it, courts treat "'loading

and unloading' [as] embrac[ing], not only the immediate transference of the goods to or from the

vehicle, but the 'complete operation' of transporting the goods between the vehicle and the place

from or to which they are being delivered." *Id*. at 494; *see also Striker*, 2018 WL 654445, at *6

("To interpret 'loading and unloading' clauses in insurance contracts, New York law subscribes

to the 'complete[] operation[]' doctrine."). Drawing on this formulation, Travelers argues that,

under the complete operation doctrine, the accident here occurred in the course of "loading" the

Furnishare truck because the transfer of the couch from the condominium to the vehicle comprised a single, albeit protracted, operation.  Travelers Mem. at 9–17; Travelers Reply at 3–4.

Although the verbal formulation of the complete operation doctrine might suggest that literally any accident during the events leading to the loading of a vehicle qualifies as "loading," the case law proves more nuanced—and limited.  Instead, decisions applying *Wagman* have repeatedly recognized that "[s]imply sustaining an [accident] during the []loading process, without any showing of negligent use of the [vehicle], does not invoke liability coverage under the vehicle insurance policy."  *Samsung Fire & Marine Ins. Co., Ltd. v. Liberty Mutual Fire Ins. Co.*, No. 20 Civ. 4809 (MKV), 2022 WL 596676, at *4 (S.D.N.Y. Feb. 28, 2022) (quoting *ABC, Inc. v. Countrywide Ins. Co.*, 308 A.D.2d 309, 310 (1st Dep't 2003)).  In particular, these cases have distilled a critical limitation on what may constitute "loading": that, to have occurred during "loading," the accident must have been "the result of some act or omission related to the use of the vehicle."  *Tishman Constr. Corp. v. Zurich Am. Ins. Co.*, 204 A.D.3d 623, 625 (1st Dep't 2022) ("While 'use' of an automobile includes loading and unloading, an accident does not arise from the 'use' of an automobile merely because it occurs during the loading or unloading process[]." (internal citation omitted)); *see also Progressive Cas. Ins. Co. v. Yodice*, 180 Misc. 2d 863, 866 (N.Y. Sup. Ct. 1999) ("Not every accident involving an automobile concerns the use or operation of that vehicle.  The accident must be connected with the use of the automobile qua automobile."), *aff'd*, 276 A.D.2d 540 (2d Dep't 2000); *United Servs. Auto. Ass'n v. Aetna Cas. & Sur. Co.*, 75 A.D.2d 1022, 1022 (4th Dep't 1980) ("Where the operation or driving function of an automobile or the condition of the vehicle itself is not the proximate cause of the injury, the occurrence does not arise out of its use or operation.").  Drawing on the precedents establishing

this limitation, Furnishare, joined by State Farm, emphasizes that the complete operation doctrine does not "indefinitely and boundlessly expand the definition of 'loading and unloading' across time and space."  Furnishare Mem. at 15–18; State Farm Mem. at 7–11.  It argues that moving the couch from the sixth-floor condominium to the Textile Building lobby was mere preparation for loading—rather than loading itself—and was too remote from any contemplated use of the vehicle to constitute loading.

Furnishare's assessment of the assembled case law is the more persuasive.

Among that case law, one case, *Elite Ambulette Corp. v. All City Insurance Company*, 293 A.D.2d 643 (2d Dep't 2002), stands out as by far the most factually apposite.  In *Elite Ambulette*, an ambulette company responded to the home of one Frank Labiak to transport him to a medical appointment.  *Id.*  Inside Labiak's second-floor apartment, the ambulette driver and attendant, both employed by Elite Ambulette, transferred Labiak from his motorized wheelchair to the company's lighter, manual wheelchair.  They then began the process of transporting him down two flights of stairs to exit the building to enter the ambulette.  *Id.* at 644.  They brought Labiak down the first flight of stairs to a vestibule before returning to his apartment to retrieve his motorized wheelchair, which was also to be transported to the medical appointment.  *Id.* Alas, while Labiak waited on the landing, above a second, shorter flight of stairs, the manual wheelchair began to roll forward.  Because the wheelchair's brakes were missing their rubber, Labiak could not stop it.  *Id.*  He rolled down the stairs and was injured.  *Id.*  The critical issue in the ensuing insurance coverage litigation was whether the accident had occurred during the "loading" process, so as to bring it within the automobile policy for which coverage was sought.

The Appellate Division held that the accident did not occur within "loading" and that the complete operation doctrine therefore did not apply.  Critically, the Appellate Division assessed,

that "Labiak's injuries occurred inside his home, as a result of a defective wheelchair and a careless attendant," while the "covered ambulette was parked outside . . . [and] not in any way involved in the accident," was decisive. *Id.* Because the accident had "occurred away from, and incidental to, the covered vehicle," it did not constitute "loading." *Id.* The auto policy involved in Elite was similar to that here. *See* Furnishare Mem. at 14 n.9; *see also Nat'l Cont'l/Progressive Claims Grp. v. Allied Cent. Ambulance Serv., Inc.*, 5 A.D.3d 745, 746 (2d Dep't 2004) (similarly holding that, where a wheelchair-bound patient fell down a flight of stairs inside her home, such was not "loading" because it was not related to the use of the ambulette outside).

Although this case involves the transport of a couch rather than a wheelchair and patient, it is in all pertinent respects on all fours with *Elite Ambulette*. In each case, the ostensibly negligent workers transported an item, destined to be loaded into a vehicle outdoors, from inside an apartment down an interior stairwell. In each case, the journey downstairs was interrupted by an accident—in *Elite Ambulette*, the wheelchair had traveled down one out of two flights; here, the couch was about to begin its descent from the sixth floor. In each case, the object being transported and the persons carrying it were still well inside the building at the time of the accident. And in each case, at the moment of the accident, the vehicle waiting outdoors (there, the ambulette; here, the Furnishare truck parked outside the Textile Building and across a sidewalk) was not in any way involved in the accident. Indeed, the accident could equally have occurred had the vehicles not yet arrived outside at all. Here, had the truck been delayed in traffic, or in the process of seeking a parking spot, or misdirected to a different location, the collision between the couch and the sixth-floor sprinkler was just as possible. That the moving truck, in fact, was waiting outside had no causal consequence.

22

For these reasons, as the Appellate Division reasoned in *Elite Ambulette*, the vehicle was incidental to the accident there. The same is so here.

Travelers attempts on several grounds to distinguish *Elite Ambulette*, but none is persuasive. That *Elite Ambulette* involved the loading of a person along with property (his wheelchair) whereas this case involves the transport of property alone (the couch), *see* Travelers Reply at 3 & n.3, is of no moment. The holding in *Elite Ambulette* did not turn on the involvement of a person; rather, the automobile policy broadly covered liability "resulting from ownership, operation, maintenance[,] [or] use" of their vehicle. 293 A.D.2d at 644. The decisive issue instead was whether the accident occurred during "loading" of the vehicle so as to result from its "use"; that inquiry does not distinguish between bodily injury and property damage. That the attendant in *Elite Ambulette* who was transporting Labiak "had gone elsewhere" at the time of the accident, *see* Travelers Reply at 3, is likewise a distinction without a difference. The paramedic had gone "upstairs to retrieve the motorized wheelchair" to be used "to transport" Labiak to a medical appointment. *Elite Ambulette*, 293 A.D.2d at 644. Contrary to Travelers's assertion, that action did not "break[] the nexus to the subject vehicle." *Compare* Travelers Reply at 3, *with* 70 N.Y. Jur. 2d Insurance § 1790 (2023) ("[W]here an accident occurs while a person who has []loaded part of the load of a vehicle is returning . . . to pick up more of the load, the accident occurs during the []loading process."); *Hertz Corp. v. Bellin*, 28 A.D.2d 1101, 1101 (1st Dep't 1967) (returning to a truck with an empty dolly to refill it for purposes of further unloading and delivering was "part and parcel of (the process of) unloading"), *aff'd*, 22 N.Y.2d 736 (1968); *and Lamberti v. Anaco Equip. Corp.*, 16 A.D.2d 121, 125–29 (1st Dep't 1962) ("unloading" encompassed repeated refilling of cement bucket attached to crane).

Although no case is nearly as factually analogous as *Elite Ambulette*, other decisions under New York law applying similar "loading" provisions reinforce that the point at which Furnishare's couch hit the sprinkler head is properly characterized as pre-loading, or preparation or staging for loading, rather than loading itself. *See ABC, Inc.*, 308 A.D.2d at 311 ("The complete operation of transporting goods may include loading and unloading, but does not encompass acts in preparing goods for loading." (citing *Frontuto v. Burgun Trucking Co.*, 168 A.D.2d 914, (4th Dep't 1990), *aff'd*, 78 N.Y.2d 938 (1991))).  In general, these have held that, where there was no act or omission relating to the vehicle, the accident was outside the scope of "loading."  For example, in *Samsung Fire & Marine Insurance Company, Limited v. Liberty Mutual Insurance Company*, a United Parcel Service ("UPS") delivery driver was injured when, after arriving at the docking area, he walked toward the rear of his truck to remove a package and tripped on debris.  2022 WL 596676, at *1.  The parties agreed (and the district court confirmed) that the underlying action did not entail an injury "related to the negligent use or maintenance of the UPS truck"; although the driver was close by the vehicle, his fall was unconnected to it, and such was dispositive.  *Id.* at *5.  As the court put the point, to treat the accident as within "loading" merely because there was *some* "causal connection between the accident and the movement of goods to or from the vehicle," would ignore New York precedent "limit[ing] [the complete operation] principle to circumstance[s] where the underlying accident is the result of some act or omission relating to the vehicle."  *Id.* (internal quotation marks omitted).  *See also, e.g.*, *Tishman*, 204 A.D.3d at 625 (accident that occurred while the claimant was in truck's exit path after unloading not covered because, "[e]ven if [it] occurred during loading or unloading of the truck, it did not arise out of the 'use' of the truck or its loading or unloading, because the injury was caused by a defective premises condition, rather than any act or omission related to

24

the use of the automobile"); *Cosmopolitan Mut. Ins. v. Baltimore & Ohio R.R. Co.*, 18 A.D.2d 460, 464 (1st Dep't 1963) (accident not within loading where injured party arrived at delivery site, took carton from truck, placed it on raised platform, picked up carton, and, holding carton, stepped down onto pier floor, and was injured due to defect in floor). *But see Striker*, 2018 WL 654445, at *7–8 (accident that occurred from employee tripping on construction debris in a construction zone was within "loading," because construction materials were "direct[ly]" connected to the truck such that the accident was not one that "could happen to anyone").

Travelers argues that where an accident is caused by the good being transferred, it falls within the meaning of "loading" even if use of the vehicle is not implicated. Travelers Mem. at 16. The case law, however, does not support that broad proposition. *See, e.g.*, *ABC, Inc.*, 308 A.D.2d at 310–11 (finding auto policy not to cover accident where driver was injured when shipping crate came apart in course of unloading vehicle, because negligent use of the truck was not shown); *Eagle Ins. Co. v. Butts*, 269 A.D.2d 558, 559 (2d Dep't 2000) (same, where accident was caused by jump of a horse that was being unloaded from a covered vehicle); *E. Chems., Inc. v. Cont'l Cas. Co.*, 23 Misc. 2d 1024, 1025 (Sup. Ct. 1960) (same, where spontaneous explosion of shipping container during unloading process caused injuries and no showing of negligence in unloading of truck); *see also Coughlan v. Turner Constr. Co.*, 296 A.D.2d 342, 342 (1st Dep't 2002) (automobile exclusion did not apply where plaintiff injured when crane hit flatbed cab while unloading a truck from the flatbed, because there was no showing that use of truck had caused injury).[12]

---

[12] Travelers relatedly contends that the law required Furnishare to identify an intervening cause, such as a defective condition, to remove the accident from the "loading" process. *See* Travelers Reply at 5. The cases above do not support this proposition, either. And "under New York law, it is the act giving rise to liability—and not the theory of liability alleged—that is determinative

Travelers also relies on *Wagman*, the fountainhead of the complete-operation line of cases, but *Wagman* does not dictate that the accident here happened during "loading." Travelers Mem. at 9–11; Travelers Reply at 3.  In *Wagman*, a clothing store sought to ship garments to its warehouse with the assistance of a carrier company.  The carrier company's truck was parked at the curb; two store employees had brought moveable racks of garments from the store to the curb.  The carrier truck's driver and helper, who were standing in the back of the truck, were then to load the garments from the curb into the truck.  These racks were close enough to the truck that these persons could lift them without leaving the vehicle.  The accident occurred when a supervisory store employee, who was counting and checking the clothes as they were loaded, walked from the curb toward the store to check on some garments and collided with a pedestrian, who was injured.  *Wagman*, 304 N.Y. at 493.  *Wagman* held that the accident occurred during loading.

*Wagman*, however, is distinguishable for at least two reasons.  First, there, the "loading" was indisputably underway at the time of the accident.  The store employees had brought several loads of clothes from the store to the truck and the supervisory employee was actively "engaged in counting and checking the clothes." *Id.* at 493–94.  By contrast, the accident on the stairwell here occurred well in advance of any act of loading anything onto the vehicle, or even opening its rear door to receive the couch.  This fact also distinguishes this case from others cited by Travelers.  *See, e.g.*, *Harleysville Preferred Ins. Co. v. Allstate Prop. & Cas. Ins. Co.*, No. 21-1955-CV, 2022 WL 2189295, at *2 (2d Cir. June 17, 2022) (auto exclusion from CGL policy

---

of whether an insurance policy exclusion applies." *Tudor Ins.*, 2013 WL 5437025, at *5.  Here, the act giving rise to asserted liability—the collision between the couch and the sprinkler head—was disconnected from the truck six stories below.

applied where claimant was injured when heavy dry-cleaning press fell off automobile's trailer, while or immediately after trailer was being detached from automobile); *Country-Wide Ins. v. Excelsior Ins.*, 147 A.D.3d 407, 409 (1st Dep't 2017) (auto exclusion from CGL policy applied to accident that occurred when employee was unloading materials from shipping trailer to an attached lift, the lift failed, and he fell), *leave to appeal denied*, 30 N.Y.3d 905 (2017); *Duncan Petroleum Transp., Inc. v. Aetna Ins.*, 96 A.D.2d 942, 943 (2d Dep't 1983) (explosion during transfer of gasoline from another tractor-trailer to insured tractor-trailer constituted "unloading" such that auto exclusion applied, even though vehicle was parked at the time), *aff'd*, 61 N.Y.2d 665 (1983); *Lamberti*, 16 A.D.2d at 125 (auto exclusion applied to accident that occurred during "unloading" of cement, where covered cement truck poured mixed concrete into bucket of a crane, which was then hoisted and directly poured to portion of building where cement was to be used, before empty bucket was lowered and returned to cement truck for new round of refilling).

Second, *Wagman* entailed the transport of goods "from the store to the curb line." 304 N.Y. at 493. *Wagman*'s statement that "loading" includes not only the "immediate transference of goods to or from the vehicle" but also their transport "between the vehicle and the place from . . . which they are being delivered" must be read in that context. *Id.* at 494. The Court of Appeals did not have before it, or purport to comment on, the earlier portion of the goods' journey high up in an apartment building. *Wagman* is silent as to how far back, in space or time, "loading" begins.

Travelers also relies on *Striker Sheet Metal II Corp. v. Harleysville Insurance Company of New York*, No. 16 Civ. 5916 (ADS) (AYS), 2018 WL 654445 (E.D.N.Y. Jan. 31, 2018), but it too does not resolve this case. The parties in *Striker* factually disputed whether the accident had occurred when an employee removed a hand truck directly from the Striker-owned truck or when

he maneuvered that hand truck, filled with [heating, ventilation, and air conditioning systems] ductwork, from the Striker truck, up a loading ramp "in the course of making a delivery." *Id.* at *6–7. But, "[r]egardless of the version [of the facts] accepted," it was undisputed that "the incident [had] occurred during the loading or unloading period." *Id.* at *7. The unexceptional conclusion that these activities had occurred during loading accorded with case law. *See, e.g.*, *Hertz Corp.*, 28 A.D.2d at 1101 (returning to truck with an empty dolly to refill it to enable further unloading and delivering was "part and parcel of (the process of) unloading"). And the policy at issue, unlike that here, had expressly defined "loading" to encompass "the movement of property by means of . . . a hand truck." *See Striker*, 2018 WL 654445, at *2. *Contra Gen. Acc. Ins. v. U.S. Fid. & Guar. Ins.*, 193 A.D.2d 135, 138–39 (3d Dep't 1993) (accident that occurred after water softener tanks had been removed from a truck, placed on a push cart, and transported to the boiler room of the delivery site premises still not within "loading" where policy's auto exclusion for accidents on "hand truck[s]" did not define that term and was, therefore, sufficiently ambiguous that a push cart was not within the exclusion). *Striker* does not speak to the very different circumstances here. And indeed, *Striker* distinguished its facts—in which a Striker employee tripped in a construction zone, over construction material, while operating construction equipment in immediate proximity to the truck delivering those construction materials—from instances in which an injury could have happened "to anyone." 2018 WL 654445, at *8. Such describes this case.

Finally, the New Jersey precedents in this area are in accord. In their gloss on the complete operation doctrine, New Jersey courts have held that "all that is required to establish coverage is that the act or omission which resulted in the injury was necessary to carry out the loading or unloading." *Kennedy v. Jefferson Smurfit Co.*, 147 N.J. 394, 399–400 (1997).

28

However, these courts have held, the accident, as under New York law, must also have had a "substantial nexus" to use of the vehicle. *Penn Gen. Ins. v. Costa*, 198 N.J. 229, 232 (2009); *see Burlington Ins. v. Northland Ins.*, 766 F. Supp. 2d 515, 525 (D.N.J. 2011). In arguing that the accident was within "loading" under New Jersey law, Travelers asserts that transporting the couch from the apartment was "necessary to carry out the loading or unloading." Travelers Mem. at 11. It notes that in a decision under New Jersey law, a court in this District found that nylon straps attached to a crane that carried steel studs from a truck at street level to the 13th floor of a building had been "necessary and integral . . . in the unloading process." *See id.* (quoting *Certain Underwriters at Lloyds of London v. Ill. Nat'l Ins.*, No. 09 Civ. 4418 (LAP), 2017 WL 4326056, at *10 (S.D.N.Y. Aug. 31, 2017)). But the activity at issue here— transporting the couch from the sixth-floor apartment to the lobby—although a necessary step leading to the loading, was considerably farther removed. More apposite is *Selective Insurance Company of America v. Zurich American Insurance Company*, No. A-5585-13T1, 2015 WL 6758358 (N.J. Super. Ct. App. Div. Nov. 6, 2015). There, a truck employee had been injured by a rogue rolling log, which employees of a separate company had been hired to roll down a steep hill to a retaining wall in preparation for loading. Finding that "loading" was not yet underway, the court noted that "[i]t was not even necessary for [the truck company's] truck to be at the site for staging to occur." *Id.* at *3. Instead, the court emphasized, "the staging could have been completed even before [the truck company] was hired." *Id.* (internal quotation marks omitted). That language could equally apply here. And, the accident there, as here, did not have a "substantial nexus" to the use of the vehicle. *See Penn Gen. Ins. Co.*, 198 N.J. at 232; *see also Selective Ins.*, 2015 WL 6758358, at *3 (substantial nexus missing where accident could have occurred even if truck had not been at site).

For these reasons, the Court holds, as a matter of law, that the accident at issue did not occur during "loading" within the meaning of that policy term. The Travelers CGL Policy's automobile exclusion and the State Farm automobile policy therefore do not apply. *See, e.g.*, *Harleysville Worcester Ins. Co.*, 314 F. Supp. 3d at 550 (where one of two "mirror" policies obligated coverage, the other policy, for that reason, did not).

**CONCLUSION**

For the reasons above, the Court (1) grants Furnishare's motion for summary judgment insofar as it seeks a declaration that Travelers is obligated to defend and indemnify it for property damage resulting from the accident; (2) denies Travelers's cross-motion for summary judgment; and (3) grants State Farm's motion for summary judgment insofar as it seeks a declaratory judgment that it is not obligated to defend or indemnify Furnishare. The Clerk of Court is respectfully directed to terminate all pending motions.

This decision does not formally resolve Furnishare's breach of contract claim, because the parties did not brief that point. The Court directs Furnishare and Travelers to submit a joint letter by May 12, 2023, setting forth their views as to the status of that claim in light of this decision.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: April 28, 2023
New York, New York